## 5835. SMITH *v.* CITY OF ROME.

1. An amendment to a petition should be allowed, where the facts added by it, however different they may be from those alleged in the original petition, show substantially the same wrong in respect to the same transaction; it is not then objectionable as adding a new and distinct cause of action. If there is substantial identity of wrong there is substantial identity of cause of action.

2. The rule forbidding a recovery from his master by a servant who subjects himself to injury by doing something he knows is dangerous is not applicable to a convict whose movements are controlled and directed by a "boss" or guard having and exercising authority to compel the convict to obey his orders.

3. The fact that there is conflict between the testimony of the plaintiff and that of his witnesses is not a good ground for the granting of a nonsuit.

4. While a servant is under no duty to observe changes from gradual wear and tear of machinery, until they become obvious to any careful man, the master's duty is to discover such changes by constant inspection, and to repair them, and to warn the servant of their existence.

5. The evidence of the plaintiff was sufficient to have carried the case to the jury, and the granting of the nonsuit was error.

DECIDED MARCH 18, 1915.

Action for damages; from city court of Floyd county—Judge Reece. June 4, 1914.

*Eubanks & Mebane,* for plaintiff.
*Max Meyerhardt,* for defendant.

BROYLES, J. The plaintiff in error, Frank Smith, brought an action for damages against the City of Rome, averring in his petition that on November 6, 1912, while confined in the chain-gang of the city, and compelled by the authorities to work in the rock-

quarry of the municipality, he was directed by the boss of the chain-gang to do certain work, in common with two other convicts, in drilling holes in the rock, for blasting; that he was compelled to hold a certain steel drill, some two and a half or three feet long, while the two other convicts struck upon the top of this drill with large hammers, and that while he was so engaged a small piece of steel was split off the top of the drill and flew into his left eye, destroying the sight thereof. He further alleged that the drill had become so battered and "spread" on the top as to be dangerous; that its condition was known to the authorities, that it had been in this condition for some weeks, and that he did not have the right to refuse to use the drill. He alleged that the city authorities were negligent in compelling him to use the defective drill, and in compelling two other convicts to strike upon the end thereof when it was in this defective condition, thereby causing a piece of steel to chip off and strike him in the eye. He alleged that it was negligence in the city to compel him to use this drill when it was made of steel not sufficiently tempered, which caused it to become battered and flattened out on the end when struck with hammers. He alleged also that he used all care possible to be exercised in his peculiar condition, and that he could not object to holding the drill while the other two convicts struck upon it, when he was ordered to do so by his boss; if he had refused to obey, he would have been liable to receive severe punishment.

On the trial the plaintiff attempted to amend his petition by striking from paragraph 12, and line 3 thereof, the following, to wit: "some two and a half or three feet long," and inserting in lieu thereof the following: "Your petitioner shows that he, with two other convicts, had already drilled a hole some two feet deep in said rock. He shows that in drilling holes in said rock at said quarry three drills were used. The first drill is some two and a half feet long. The first drill had already been used, and said hole in said rock had already been drilled out to a depth of some two feet, and it became necessary to use the second drill, which was some three and a half or four feet long. He shows that said second drill was in bad repair, and was dull, and was not filed or suited for use; that thereupon said boss aforesaid directed and commanded petitioner and said two other convicts to use the third drill, which said drill was some five and a half or six feet long. He shows that

said third drill was about two feet too long to drill the hole as it had been made by the said first drill, and that because of said length of said drill, when petitioner was holding and turning same in the drilling of said hole, the end of said drill, which said two convicts were striking, came up even with the eyes and face of petitioner; that if said boss had used a drill of the proper length, the end thereof would have extended only to about the breast of petitioner when using same, and not at or near the eyes of petitioner. Petitioner shows that in drilling a hole in rock at a quarry the person turning said drill of necessity squats or sits on some object near the ground; that this is necessary in working and turning said drill, and petitioner was so doing in the proper discharge of his duties on said date. He shows that the person working and turning said drill never stands but always assumes the condition [position?] aforesaid; that if the defendant through its agents had used on said date and at said time drill No. 2, as aforesaid, that the end of same would not have extended up, at, or near the eyes of petitioner, [but] the end of said drill would have been at and near the eyes [breast?] of petitioner. He shows that it was negligence in said city in using said third drill which was too long as aforesaid. (2) Petitioner shows that it was negligence in said city, through its officers and agents aforesaid, in compelling petitioner to work at said drill with two said convicts striking the end of said drill. (3) He shows that the position occupied by two said convicts is an important one, that only experienced technical and expert men can properly do the work which said men were doing; that a common and inexperienced laborer can not properly perform said work in the striking of the end of said drill; that inexperienced and incapable and non-expert men, such as the two convicts aforesaid were, can not strike the end of a drill in drilling holes in a rock, because an inexperienced and common laborer can not hit the end of a drill, and as a result of said striking by said incapable men the end of said drill had become battered as is set forth in petitioner's original declaration." This amendment was disallowed. Plaintiff then offered to amend his petition by striking from paragraph 12, line 3, the words "two and a half or three feet," and inserting the words "six feet," so that the said description of the drill should read, "about six feet long." This amendment also was disallowed, and the plaintiff assigns error upon the disallowance of each amendment.

The plaintiff testified, that upon the day above mentioned he was serving a sentence in the city chain-gang; that he was under the direction of a "boss," one Marshall, who directed him where to work, with what tools, and in what manner to perform his work; that he was allowed no freedom in the selection of his tools or his place of working; that upon the morning of the injury he was given all of his instructions by Marshall, the chain-gang boss; that he stated to Marshall that he objected to turning a drill under those inexperienced or "green" men, but that Marshall made him go, and he went; that, by reason of the absence of one of the three drills usually employed in drilling the holes for blasting, he used the longest drill, one about six feet in length; that he "did not have the proper steel, the next following, to go into the hole at that time and had to use another steel;" and that while holding the final or longest drill, which was "frazzled," battered, and split down at the top, and while the two other convicts were striking it with hammers, a small piece of steel from the drill flew off and struck him in the left eye, knocking him over; that it cut a hole in the lid of his eye, and made a little wound on the ball of the eye. "When I was hurt, the men who were working with me hollered to the 'boiler,' and Tom Harris came up and washed my eye, but never gave me anything to put on it then. When I was brought back to the station-house they gave me some turpentine to put on it. I never had anything to wrap it up with." He testified that he got out of the chain-gang the next day, as his sentence of thirty days had expired; and thereafter his eye was treated by Dr. Smith, an eye-specialist, until treatment became useless, the sight having been destroyed. The plaintiff further testified that the drill he was using was worn down, especially on the sides of the top, and that the edges of the top of the drill were battered and flattened out, and that "untrue hammering" made it that way; that steel always has a temper just the same as when it comes from the manufacturer, "but it is the untrue hammering that causes it to become battered and flattened out, hitting it first on one side and then on the other. If it is not hit plumb on the head, the edges of it split." "Steel that is too soft will batter. Steel that is too hard will break off, or flake off." "Those men hit that steel first on one side and then on the other. It should have been hit plumb on the head. They did not hit it plumb on the head, and that is what made it

split off. If you hit it on the head it will go down evenly." "I understood turning the drill, and I was the only one who had been there about thirty days who showed any experience about turning." "Mr. Marshall told me that morning to go up there where the two green convicts were waiting for a turner, but I objected to going, and said, 'You have some green whippers up there, I don't like to turn under green men who have just come from a hotel.' But he told me to go, and I went, and did not object any more." "Steel generally comes out of the hardware store just like it is pulled through the roller in the rolling-mill, but if it is hit true it will last that much longer. I am not an expert about steel, and don't know whether it was hard or soft."

A. R. Davis, introduced by the plaintiff, testified as an expert upon the properties of steel as follows: "If a piece of steel which is being used for the purpose of drilling a hole in a rock, for blasting, becomes battered on the ends and flattened out, that would indicate that that piece of steel is soft; if it should splinter off, that would show it was hard. If it was too hard and the end of it is hammered, pieces of it would flake and fly off; but if you had it too soft on the end upon which you hammered, it would batter and flatten out. It would be impossible to provide against steel battering out over the top and flattening out, but the softer it is the more it batters out and the less soft it is the less it batters out; the harder it is, the more it flakes off. A point at which it could be tempered just right and proper, where it would not flake too much nor spread too much, is a condition which you could hardly reach; but the nearer you reach that point, the nearer your ideal steel is reached for the purpose of drilling. A man using a drill for drilling a hole in a rock ought to have a drill that is as near perfect an ideal as he can get; if you have it too hard it will flake off,—something has got to give, and the steel, of course, is harder on the end of it. It would be impossible to make steel absolutely to suit the condition. It would be bound to flake off or to flatten out some; but if it had a certain degree of temper in it, it would not flatten out as fast as it would otherwise. I think the steel at the top has to be, to a certain extent, flattened,—I mean soft, in order to do its work. All drills batter out at the edges, to a certain extent; that is a condition which you can not prevent absolutely. When a steel drill is hammered upon it finally becomes an um-

brella shape on top, and you have to keep it ground down and shaped up."

At the conclusion of the testimony for the plaintiff (a substantial summary of which we have given), upon the motion of counsel for the defendant, on the ground that the allegations in the petition and the proof did not agree, and that there had been no proof whatever in support of any of the material allegations set forth in his petition, the court granted a nonsuit. To this judgment the plaintiff excepted.

1. The record does not disclose upon what ground or grounds the amendments offered by the plaintiff were disallowed by the trial judge. It is argued in the brief of the defendant (and we assume it was so argued in the court below) that the facts alleged in the proposed amendments were not brought to the notice of the governing authorities before the suit was instituted, and also that they set up a new and distinct cause of action. In *Kennedy* v. *Mayor &c. of Savannah,* 8 *Ga. App.* 98 (68 S. E. 652), it was held by this court that "Only such substantial compliance with the provisions of the act of 1899 (Acts 1899, p. 74), requiring notice to be given to municipal corporations of claims for damages against them, is necessary as will enable the municipality to fully investigate the claim and to determine whether it prefers to adjust the claim without suit or to contest its validity in the courts." See also *Smith* v. *Elberton,* 5 *Ga. App.* 286 (63 S. E. 48) ; *Langley* v. *Augusta,* 118 *Ga.* 590 (11, 12), 600 (45 S. E. 486, 98 Am. St. R. 133). Counsel for the defendant argues also very earnestly that the proposed amendments set up a new and distinct cause of action, for the reason that the original petition alleged that the steel drill used by the defendant when injured was "about two and a half feet long," whereas by amendment it was sought to allege the length of the defective drill to be about six feet, and also, by the first amendment, it was proposed to add a new element of negligence, in that by the use of the six-foot drill, which was too long, out of its proper order, the striking point was brought in line with the plaintiff's eye and face, when, had the proper drill (the one shown to have been missing) been used, it would have extended only to his breast.

It is clear to us that the second amendment should have been allowed. When we come, however, to consider the first one, we are

beset with more difficulty. We can not agree, though, with the learned counsel for the defendant, that the allegations in this amendment set up a new cause of action, or that they were so different from the averments in the petition that the municipal authorities could not, by the exercise of proper diligence, have ascertained the truth of the transaction, and the merit, if any, of the plaintiff's claim. That claim was, substantially, that the plaintiff was injured by reason of being compelled to hold a defective and dangerous drill while two fellow-convicts struck upon it with hammers, and that a piece of the drill flew off while he was so holding it and struck his left eye, thereby destroying its sight. We think there was enough in the petition to authorize this amendment, which, while amplifying and correcting statements in the petition, and stating additional acts of negligence (which showed substantially the same violation of the same right), did not set up another cause of action. As said by Chief Justice Simmons, in *City of Columbus* v. *Anglin,* 120 *Ga.* 785 (48 S. E. 318): "Amendments are allowed to cure defects. The original petition need not be perfect either in form or substance, but it should have in it at least enough to indicate some particular cause of action. . . He may, however, add further facts to more fully describe the cause of action,—the wrong,—which he originally alleged. He may allege additional facts to show the existence of his primary right, as long as he does not undertake to set up another and distinct right. And he may allege additional facts to show that the defendant has been guilty of the alleged violation of the plaintiff's right. If there is substantial identity of wrong (which necessarily includes identity of the right violated), there is substantial identity of cause of action. This identity is not the same as that required between allegata and probata. . . So long as the facts added by the amendment, however different they may be from those alleged in the original petition, show substantially the same wrong in respect to the same transaction, the amendment is not objectionable as adding a new and distinct cause of action. . . A single cause of action is not multiplied and made more than one merely because the facts showing it are alleged only partially in the original petition, and the allegations completed in the amendment." And it was held by the Supreme Court, in *Bowen* v. *Adams,* 129 *Ga.* 688 (59 S. E. 795), that "an amendment which sets forth an act of

negligence additional to others originally pleaded, as being a concurring and contributing cause of the injury, for which damages are asked in the original petition, does not add a new and distinct cause of action." In the instant case, while the alleged wrong done to the plaintiff was single, several alleged acts of negligence entered into it. It was alleged, (1) that the drill was defective by reason of being battered and "spread" on the top, and (2) that the drill was too long for the hole in which it was being used; and the fact that the first allegation was made in the original petition, and the second one in the amendment, is immaterial. Only one injury—one wrong—was declared in both petition and amendment. See also *Ellison* v. *Georgia R. Co.,* 87 *Ga.* 691 (13 S. E. 809); *Western & Atlantic R. Co.* v. *Burnham,* 123 *Ga.* 28 (50 S. E. 984); *Georgia Ry. & El. Co.* v. *Reeves,* 123 *Ga.* 697 (51 S. E. 610); *Central of Georgia R. Co.* v. *Inman,* 129 *Ga.* 654 (59 S. E. 784); *Charleston & Western Carolina R. Co.* v. *Lyons,* 5 *Ga. App.* 668 (63 S. E. 862); *Deen* v. *Wheeler,* 7 *Ga. App.* 507 (67 S. E. 212); *Southern Ry. Co.* v. *Flynt,* 9 *Ga. App.* 757 (72 S. E. 189); *Smith* v. *County of Jasper,* 9 *Ga. App.* 667 (72 S. E. 65); *Heard* v. *Camp,* 10 *Ga. App.* 167 (72 S. E. 1098). Construing this amendment most strongly against the pleader, we are of the opinion that the additional acts of negligence which it sets out constitute, at most, merely concurring and contributing causes of the original wrong, and that they did not add any new or distinct cause of action; and that the court erred in not allowing this amendment.

2-4. Error is also assigned upon the judgment of the court in granting a nonsuit and dismissing the case. The learned counsel for the defendant argues that the nonsuit was properly granted, because the court permitted the plaintiff to introduce all the evidence which could possibly have been introduced if the amendments had been allowed, and still there was insufficient evidence to go to the jury; that the plaintiff, by his testimony, showed that he knew the condition of the drill, saw that it was too long, and yet made no objection to using it, and that "his entire action in the transaction was voluntary and not under any compulsion whatever;" that there was no proof that the city authorities knew or had reason to know that the drill was dangerous; and that the plaintiff's expert witness, Davis, testified that it would be impossible to make a steel drill which would not flatten or batter out on

the top when hammered upon. If the amendments had been allowed, there would have been but little variance between the allegata and probata, and we can not say that the jury would not have been authorized to find that the defendant municipality was liable for the injury (which was undisputed), at a time and place undisputed, due to some one of the negligent acts alleged. We do not, of course, intimate that these facts would require a recovery for the plaintiff, but, in our opinion, the acts of negligence alleged in the petition and in the amendments were sufficiently supported by proof to have carried the case to the jury. The plaintiff charged several acts of negligence against the defendant, and his evidence substantially supported the allegations in his petition and in his amendments, at least as to some of them; and, as said by this court in *White* v. *Seaboard Air-Line Railway,* 14 *Ga. App.* 139 (4), "The plaintiff's petition averred that the defendant was negligent on each and all of these grounds, and the plaintiff was entitled to recover upon the proof of any one of them, if the jury determined that any one of the charges of negligence was sustained. Consequently the court erred in awarding a nonsuit." While the testimony of Davis, the expert witness introduced by the plaintiff, contradicted, in some respects, the plaintiff's own testimony, and tended to show that the injury was an unavoidable accident, we think that there was sufficient doubt on this latter point for it to have been passed upon by the jury; the former point,—as to contradictions between the testimony of the plaintiff and his witnesses,—if true, is not good ground for a nonsuit. In *Outcault Advertising Co.* v. *American Furniture Co.,* 10 *Ga. App.* 211 (73 S. E. 20), this court said, that "the fact that there is conflict in the testimony of witnesses introduced by the plaintiff is no reason for granting a nonsuit. The issue of fact, nevertheless, goes to the jury." And in *Henry* v. *Etowah Dredging Co.,* 141 *Ga.* 406 (81 S. E. 197), the Supreme Court held, that, "although the evidence introduced by the plaintiff from some of his witnesses may have conflicted with his testimony, as to whether the machinery which caused the injury to him was safely constructed, and whether the injury was brought about by the plaintiff's own carelessness in the manner of its operation, yet in the light of his own testimony it can not be said that there was no evidence authorizing the case to be passed on by the jury. The differences in the testimony of wit-

nesses introduced by the plaintiff do not furnish ground for nonsuit, if there is evidence sufficient to carry the case to the jury. What the truth may be is for their determination."

As to the contention that no proof was introduced to show that the city authorities knew or had reason to know that the drill was defective, the undisputed evidence was that it was defective; and as the law imposes upon the master the duty, by constant inspection, to observe when machinery or tools used by his servants, become dangerous or defective, we can not hold that the jury could not legally have inferred that the city authorities knew or should have known of this defect. Section 5743 of the Civil Code provides that "In arriving at a verdict, the jury from the facts proved, and sometimes from the absence of counter-evidence, may infer the existence of other facts reasonably and logically consequent on those proved." And in *Cochrell* v. *Langley Manufacturing Co.*, 5 *Ga. App.* 317 (3), 323 (63 S. E. 244), this court held, that "a servant is under no duty to observe changes resulting from gradual wear and tear of machinery until they become obvious to any careful man. The master's duty is to find out such changes by constant inspection, and to repair them, and to warn the servant of their existence."

The contention that the plaintiff, as shown by his testimony, knew of the defective condition of the drill, and voluntarily assumed the risk, has, in our opinion, no merit whatever. This plaintiff was a convict, laboring in a chain-gang, under the direction of a chain-gang "boss," and to term any action of his, relating to his work in his unfortunate environment, "voluntary" would be, to say the least of it, a violent assumption. Nor do we believe the learned counsel will seriously maintain that in such peculiar circumstances a convict is "under no compulsion whatever" in the selection of his place of work, the manner of performing his labor, or the selection of the tools or implements employed. Even though the plaintiff admitted his previous knowledge of the alleged defective condition of the drill, such knowledge is not necessarily conclusive of negligence on his part; it must depend upon the facts of the particular case; and in the instant case the plaintiff testified that he objected to holding the drill while the two inexperienced convicts struck it, but that his boss, Marshall, made him do it. As said by Justice Lumpkin in *Chattahoochee Brick Co.* v. *Braswell*,

92 *Ga.* 634 (18 S. E. 1016): "Ordinarily, where a servant is ordered by his master to engage in a work, or go into a place which the servant knows to be dangerous, the latter is not bound to obey the order, and if he does so with full knowledge of the impending peril, the master may not in law be liable for the consequences. In the present case, however, the plaintiff had no election. When the guard said go, he was obliged to go; and there is no hardship in compelling a corporation of which the guard was an employee to compensate the plaintiff for injuries received because of his obedience to the guard's commands." See also *Boswell* v. *Barnhart,* 96 *Ga.* 521 (23 S. E. 414).

5. There was, in our opinion, sufficient testimony adduced by the plaintiff, in support of the allegations of the petition and of the amendments, to carry the case to the jury, for their determination of the truth of the matter, and the judge erred in refusing the amendments, and in granting the nonsuit.    *Judgment reversed.*